IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

UNITED STATES OF AMERICA

v.

ROLANDO MARTINEZ,

             Defendant.

CRIMINAL CASE NO.

3:09-CR-0005-JTC-JFK

## REPORT AND RECOMMENDATION

Pending before the court is Defendant Rolando Martinez's motion [Doc. 39] to suppress evidence obtained as the result of a warrantless search of the tractor-trailer he was operating and after his warrantless arrest. An evidentiary hearing was held on the motion on January 12, 2010.[1] [Doc. 46]. Defendant contends that the evidence, a quantity of marijuana, seized from the trailer and other documents obtained from him during the stop on April 26, 2009, should be suppressed because the Georgia State Patrol Trooper lacked probable cause to conduct the traffic stop and lacked a reasonable suspicion to detain him to investigate other criminal activity and because Defendant did not voluntarily consent to the search of the trailer. [Doc. 48]. Defendant also contends that the Trooper lacked probable cause for his arrest. [Id.].

---

[1]Citations to the transcript are: (Tr. at ).

And Defendant moves to strike the testimony of the Trooper who conducted the stop. [Doc. 48]. The Government opposes the motion to suppress contending that the Trooper had probable cause to conduct the traffic stop, the duration of which was reasonable, and had a reasonable suspicion to detain Defendant to investigate whether he was engaged in other criminal activity, that Defendant's consent to search the trailer was voluntary, and that Defendant's statements, after receiving and waiving <u>Miranda</u> rights, were voluntary. [Doc. 49].

**<u>Motion to Suppress</u>**

## I.     Facts

On April 26, 2009, James Thompson, a Georgia State Patrol Trooper ("Trooper"), was on patrol, actually parked on the side of I-85 northbound, at approximately mile marker 6. (Tr. at 4-6). Trooper Thompson had been a Trooper for about eight years and was a POST certified law enforcement officer. (Tr. at 4, 33). His duties included the enforcement of traffic and criminal laws in the State of Georgia, and he had received over 100 hours of specialized training involving criminal interdiction of drug trafficking, such as, location of hidden compartments, drug transactions, and drug interdiction programs offered by federal law enforcement agencies. (Tr. at 5). Prior to his employment with the Georgia State Patrol ("GSP"),

2

Trooper Thompson worked as a Deputy Sheriff with the Fayette County Sheriff's Office with duties including patrol and in the narcotics division. (Tr. at 5).

As the Trooper observed northbound traffic, he saw a tractor-trailer which slowed as it passed him, and he heard a "thumping or pounding noise on the pavement" which, based on the Trooper's experience, was indicative of bad tires. (Tr. at 6, 10, 36, 60). The Trooper pulled out to follow the tractor-trailer in order to examine the tires closer, and as he did so, he "saw that he [i.e., the tractor-trailer,] was well over the fog line and come back." The Trooper testified that the failure to maintain lane was a violation of O.C.G.A. § 40-6-48. (Tr. at 6, 37-39). The Trooper turned on his video tape in the patrol vehicle and observed that the truck "went over the fog line again and came back, and then kind of rode the fog line." (Tr. at 6, 39-41).[2] He therefore decided to conduct a traffic stop for failing to maintain lane and to investigate the suspected bad tires and, because of the early morning hours, whether the tractor-trailer driver was impaired. (Tr. at 6, 10, 42). At approximately 1 minute 15 to 20 seconds, i.e., 1:15-1:20, into the video, Trooper Thompson turned on his blue

---

[2]The Government introduced the video recording from the Trooper's vehicle, Gov't Ex. 1, and played parts of the tape during the hearing. (Tr. at 6-8). The court's viewing of the tape confirms the Trooper's testimony regarding the events of April 26, 2009.

3

lights to effect the traffic stop. (Tr. at 9). The tractor-trailer stopped at approximately 1:40 on the video tape. (Tr. at 9).

The Trooper stopped his patrol vehicle behind the tractor-trailer and exited the vehicle, walking up to the cab of the truck on the passenger side. (Tr. at 9). The Trooper spoke to the driver, Defendant Martinez, first asking if anyone else was in the truck, and Defendant responded, no. (Tr. at 9). The Trooper then asked if he could step up on the running board to speak with Defendant, and after Defendant agreed, the Trooper asked Defendant for his driver's license, which was a Texas driver's license, and for the truck's paperwork, which included registration and insurance. (Tr. at 9). As he obtained the papers, the Trooper asked Defendant about his trip, and Defendant responded that he had just left exit 1 where he had been for nine hours. (Tr. at 9). The Trooper explained to Defendant that he had stopped him for the bad tires and failing to maintain lane and asked Defendant for his log book and bill of lading, which he obtains as part of his normal field interview. (Tr. at 9-10, 61).

The Trooper also noticed as he initially walked up to the cab of the truck, that the trailer was not sealed which caused him to question whether the truck was engaged

4

in a legitimate enterprise.[3]  (Tr. at 10-11).  He stated that based on his experience as a Trooper and operating a trucking business, he knew that trailers typically were sealed to prevent tampering with the load.[4]  (Tr. at 11, 61).  After obtaining the documents from Defendant, the Trooper walked with Defendant to the back of the trailer where he pointed out the problems with the tires which showed gaps and wearing of the tread. (Tr. at 17-18, 44-45, 59-60; Gov't Ex. 6).  The Trooper then asked Defendant if he had been drinking or was on medication to determine if he was impaired and, based on his conversation with Defendant and observing his speech and eyes, decided that Defendant was not impaired.  (Tr. at 18, 44).  At approximately 8:30 on the video tape and continuing until approximately 20:23 on the video tape, as part of his normal field interview, the Trooper entered the patrol vehicle to run computer checks on Defendant and to examine the paperwork provided by Defendant.  (Tr. at 18).

As he examined the bill of lading, the Trooper noted that Defendant had picked-up a load of produce in McAllen, Texas, on April 23, 2009, destined for All Seasons

---

[3]Because the trailer was not sealed, Defendant could have entered and opened the boxes.  (Tr. at 55).

[4]The Trooper stated that he had owned a small trucking company, hauling gravel and sand locally and still possesses a CDL license.  (Tr. at 33-34).  He acknowledged that his gravel and sand loads, hauled in dump trucks, were not sealed.  (Tr. at 36).  He also stated that he was not familiar with the perishable commodities act.  (Tr. at 34).

AO 72A
(Rev.8/82)

Produce in North Carolina. (Tr. at 12; Gov't Ex. 2). The bill of lading was handwritten, not computer generated, which was not consistent with the majority of such documents examined by him during his experience as a Trooper in stopping numerous trucks nor with his training as a law enforcement officer. (Tr. at 12-14, 34-35, 61). He also noted the delay in transporting the produce, that is, that three days had passed since picking up the load of perishable commodities, the fact that the load was marked "paid," and that there was no specific delivery address. All of this information was inconsistent with bills of lading he had examined for legitimate business enterprises and based on his experience in stopping other trucks, causing his suspicions to increase about the legitimacy of the load being transported by Defendant. (Tr. at 14-15, 35, 47-48, 61).

The Trooper also examined the log book provided by Defendant and noticed that it was not current, the last entry being April 25, 2009, when Defendant explained that he entered on duty. Defendant had stated that he had not caught the log book up. (Tr. at 15-16; Gov't Ex. 3). The unexplained time in the log book, no indication therein of the reason for travel delay, and the travel back and forth all raised the Trooper's suspicions based on his training and experience. (Tr. at 16-17, 61-62).

6

The Trooper exited the patrol vehicle and spoke with Defendant. As he was writing a warning to issue to Defendant, at approximately twenty minutes into the traffic stop, the Trooper noticed that Defendant was fidgeting and sweating, although the Trooper stated that it was cool and he was wearing a jacket. And Defendant was rubbing his face and coughing, claiming that the bugs were bad, although the Trooper was not bitten or bothered by any bugs. All of this conduct by Defendant was considered nervous behavior by the Trooper. (Tr. at 19-20, 49, 61). As he was completing the warning, the Trooper asked Defendant if there was marijuana or cocaine in the truck. (Tr. at 20, 45-46). Before answering, Defendant glanced down; because, he had looked the Trooper in the eye when answering other questions, the Trooper said this action added to his suspicions. (Tr. at 20, 61). At approximately twenty-four minutes into the traffic stop, the Trooper handed the warning and all of the other paperwork back to Defendant, ending the traffic stop.[5] (Tr. at 20, 45-46).

The Trooper then asked Defendant if he could see the fuel receipts for the purpose of helping to explain the gaps in the log book. (Tr. at 21). The Trooper testified that the request to examine the fuel receipts was in furtherance of his

---

[5]At this time, the Trooper testified that he did not intend to allow Defendant to leave without searching the tractor-trailer. (Tr. at 45). The record is devoid of any evidence that the Trooper voiced or otherwise made this intention known to Defendant.

AO 72A
(Rev.8/82)

investigation of the other suspicious activity and that he hoped the fuel tickets would shed some light on Defendant's activities that day and explain the delay in his travel. (Tr. at 46-48). Defendant agreed and went to retrieve the fuel receipts but was locked out of the cab of the truck. The Trooper loaned Defendant pliers, and after approximately seven minutes, Defendant was able to enter the cab and obtain the receipts which he provided to the Trooper.[6] (Tr. at 21). The Trooper returned the receipts and, at approximately 32:50 on the video tape, asked Defendant if he could search the trailer. Defendant replied, "Yes, sir." (Tr. at 22, 49).

The Trooper had a consent to search form with him and filled out the form completely, including identifying the trailer as being part of the consent to search, before handing it to Defendant to read. (Tr. at 23, 50-51). As the Trooper was completing the form, Defendant advised that he had received a ticket in Lavonia, Georgia, which caused the Trooper to be suspicious as to why he abruptly changed the subject. (Tr. at 25). At around twenty-five minutes into the stop or at approximately 33 on the video tape, the Trooper explained the form to Defendant and asked Defendant to read the form. He stated to Defendant that, if he agreed to the search, to

---

[6]During this time, a second Trooper, John Morris, arrived as back-up. (Tr. at 21-22).

8

sign the form but if not, not to sign the form. The Trooper stated that he made sure

Defendant understood that he did not have to sign the form. (Tr. at 23-25, 51-52). The

form stated:

GEORGIA STATE PATROL
CONSENT TO SEARCH

I, *Rolando Martinez* hereby grant my consent to *Thompson, Morris, Mitchell* Troopers of the Georgia State Patrol to search the following described vehicle including luggage, containers, and contents of all. This includes the removal of any suspicious paneling or other vehicle components and the least intrusive access to any constructed compartment used for the purposes of concealing contraband.

| Color | Year | Make | Body Style | License Number |
|-------|------|------|-----------|----------------|
| *White* | | ~~*White*~~ | *Trailer* | *Y23872 (Tx)* |
| *Red* | *2003* | *Freightliner* | *Tractor* | *RF2N83 (Tx)* |

I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form. I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to this form.

My consent to search is freely and voluntarily given.
Date  *4-26-08*          Time  *0655*
                         *Rolando Martinez*
                         Signature

(Tr. at 24; Gov't Ex. 4) (italics indicates information added to typewritten form). The

Trooper asked Defendant if he had observed the trailer being loaded, and Defendant

responded, yes. (Tr. at 26). Then he asked Defendant if there was anything illegal in

9

the trailer, and Defendant responded, no.  (Tr. at 26).  After examining the form, for approximately thirteen seconds, at approximately 34 on the video tape, Defendant signed the form.  (Tr. at 23, 26, 52).

The Trooper entered the trailer and, using a ladder, climbed on top of the boxes of produce.[7]  He observed that boxes of peppers were open.  (Tr. at 26-27, 52-54, 62). The Trooper did not open the boxes.  (Tr. at 53-54; Gov't Ex. 5).  The Trooper crawled to the front of the trailer and observed tool marks which indicated a hidden compartment.  (Tr. at 27, 54).  He examined the refrigeration unit and then exited the trailer to obtain tools and his camera.  (Tr. at 27, 54, 63).  When he reentered the trailer and moved a box of peppers, he observed an open box with suspected bales of marijuana.  (Tr. at 27, 54-55).  He cut into one of the bundles and observed a green leafy substance, which based on his training and experience, had the appearance and odor of marijuana.  (Tr. at 30-31, 54, 63).  The search of the trailer on the road side took approximately forty minutes.  (Tr. at 53).  The Trooper ticketed Defendant for

---

[7]Due to the fact that the load was refrigerated, in order to keep the contents of the trailer cool, the Trooper closed the door of the trailer while he was inside.  (Tr. at 62).

AO 72A
(Rev.8/82)

trafficking in marijuana, read him <u>Miranda</u> rights[8], and decided to move the trailer, with Defendant, to the WalMart Distribution Center about twelve miles away in order to off-load the marijuana. (Tr. at 30-32). After the marijuana was off-loaded, the tractor-trailer was moved to and secured at the Troup County Sheriff's Office. (Tr. at 30).

While the tractor-trailer was being off-loaded at the WalMart Distribution Center, Drug Enforcement Administration ("DEA") Task Force Agents ("TFA") Gordon and Best arrived at approximately 10:00 a.m. (Tr. at 64-66). They observed Defendant, who was not handcuffed, sitting near the rear of the trailer and spoke briefly with the Troopers while examining the paperwork and items found in the tractor-trailer. (Tr. at 66). The TFAs then spoke with Defendant, identifying themselves and determining whether Defendant spoke English. (Tr. at 66-67). Defendant indicated that he had attended school in the United States and, although he spoke Spanish, preferred to converse in English. (Tr. at 67). He did not appear to be under the influence and was a little nervous but calm. (Tr. at 67). The TFAs were armed, but their weapons were concealed. (Tr. at 73).

_____

[8]Defendant stated that he understood his rights but did not make any statements at that time. (Tr. at 32, 57). Defendant did not state that he had knowledge of the contents of the trailer or had opened the boxes in the trailer. (Tr. at 55, 58).

11

Using a DEA 13-A card, TFA Gordon read Defendant <u>Miranda</u> rights, stating,

Before we ask you any questions, you must understand:
- You have the right to remain silent.
- Anything you say can be used against you in court.
- You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.
- If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

Do you understand?
Are you willing to answer some questions?

(Tr. at 67-69; Gov't Ex. 7). Defendant stated that he understood his rights and agreed to answer questions. (Tr. at 67, 69). Defendant remained seated during the twenty to twenty-five minute interview and remained un-handcuffed. When he stated he was thirsty, TFA Gordon gave him a soft drink. (Tr. at 69-70).

The next day, at the DEA office, during processing, Defendant stated that he wanted to talk with TFA Gordon. (Tr. at 71). Defendant was not physically restrained and was very cooperative, and the agents were not armed. (Tr. at 73). TFA Gordon advised Defendant to remember the rights read to him the day before and that those rights still applied to him. (Tr. at 71). Defendant stated that he had not been allowed to use the telephone to call his son and stated that he wanted to cooperate. He asked what was needed. The TFA responded, "We need the truth." (Tr. at 71). The TFA did not use any coercion, and Defendant spoke with him voluntarily. Defendant stated,

"You guys have treated me well, I need to figure out what happened. I want to help you guys." (Tr. at 71). Because Defendant was hesitating, TFA Gordon stated to Defendant that the charges were serious and that he needed to speak with a lawyer first and stopped Defendant from speaking with him. (Tr. at 71).

Additional facts will set forth as necessary during discussion of Defendant's claims.

## II.     Discussion

As noted, Defendant contends that the evidence, a quantity of marijuana seized from the trailer and other documents obtained from him during the stop on April 26, 2009, should be suppressed because the GSP Trooper lacked probable cause to conduct the traffic stop and lacked a reasonable suspicion to detain him to investigate other criminal activity. [Doc. 48]. Defendant also contends that he did not voluntarily consent to the search of the trailer. [Id.]. And Defendant contends that the Trooper lacked probable cause for his arrest. [Id.]. The Government opposes the motion to suppress arguing that the Trooper had probable cause to conduct the traffic stop, the duration of which was reasonable, and had a reasonable suspicion to detain Defendant to investigate whether he was engaged in other criminal activity, that Defendant's consent to search the trailer was voluntary, and that Defendant's statements, after

13

receiving and waiving <u>Miranda</u> rights, were voluntary. [Doc. 49]. After consideration of the totality of the circumstances surrounding the traffic stop, consent and post-arrest statements, the court recommends that Defendant's motion to suppress be denied.

### a.    Traffic Stop

"A traffic stop, which 'is a seizure within the meaning of the Fourth Amendment,' . . . 'is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with <u>Terry</u>[ v. Ohio], 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 [(1968)].'" <u>United States v. Spoerke</u>, 568 F.3d 1236, 1248 (11th Cir. 2009) (citations omitted). As the Eleventh Circuit Court of Appeals stated in <u>United States v. Cooper</u>, 133 F.3d 1394 (11th Cir. 1998), "law enforcement 'may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.'" <u>Id.</u> at 1398 (quoting <u>United States v. Strickland</u>, 902 F.2d 937, 940 (11th Cir. 1990)). And "[w]hen determining whether an officer had probable cause to believe that a traffic violation occurred, the 'officer's motive in making the traffic stop does not invalidate what is otherwise

14

objectively justifiable behavior under the Fourth Amendment.'"[9] United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008) (citation omitted).

As noted, law enforcement officers may also briefly detain individuals for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has engaged in, or is about to engage in, criminal

---

[9]Defendant makes reference to the Trooper's testimony at the evidentiary hearing that he did not intend to allow Defendant to leave without searching the tractor-trailer for the court to consider in resolving the motion to suppress. [Doc. 48 at 7, citing Transcript at 45]. Defendant also argues that the traffic stop was a pretext for conducting a search for contraband. [Doc. 48 at 7]. Neither argument supports a finding that Defendant's Fourth Amendment rights were violated. The law is well established that "'[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'" United States v. Jones, 377 F.3d 1313, 1314 (11th Cir. 2004) (quoting Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996)); see also United States v. McGough, 412 F.3d 1232, 1239 (11th Cir. 2005) (indicating that the magistrate judge had improperly discussed the officers' motives for entering the apartment in resolving the case, the appellate court noted that the test "is an objective one"). Applying this rule of law, the Eleventh Circuit Court of Appeals rejected a defendant's contention that her consent to search was invalid and that the case should be evaluated as if there was no consent to search at all because the officer had since the incident testified that he would have conducted the search even without consent. United States v. Hernandez, 418 F.3d 1206, 1209 n.4 (11th Cir. 2005). The court rejected the contention because "[a]n officer's 'subjective intentions' are not relevant for Fourth Amendment analysis." Id. See also United States v. Gonzalez, 2009 WL 243732, at *3 (M.D. Ala. August 7, 2009) (rejecting the defendant's contention that traffic stop for improper or erratic lane change was a pretext to conduct a search for contraband); United States v. Artiles-Martin, 2008 WL 2600787, at *5 (M.D. Fla. June 30, 2008) (the defendant's contention that traffic stop was pretext to conduct search of tractor-trailer foreclosed by Whren).

15

activity. See Terry, 392 U.S. 1, 88 S. Ct. 1868; Harris, 526 F.3d at 1337 (same); United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (same). "[T]he 'reasonableness' standard requires that a police officer 'be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant that intrusion.'" United States v. Mikell, 102 F.3d 470, 474-75 (11th Cir. 1996) (citing Terry, 392 U.S. at 21, 88 S. Ct. at 1880); see also United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995) ("The reasonableness of the officers' conduct must be judged against an objective standard: 'would the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate.'") (citations omitted)). Additionally, "[d]uring a lawful traffic stop, officers . . . may take steps that are reasonably necessary to protect their personal safety . . ., including requiring the driver and passengers to exit the vehicle 'as a matter of course.'" Spoerke, 568 F.3d at 1248 (quoting Maryland v. Wilson, 519 U.S. 408, 410, 117 S. Ct. 882, 884, 137 L. Ed. 2d 41 (1997); Pennsylvania v. Mimms, 434 U.S. 106, 110-12, 98 S. Ct. 330, 333-34, 54 L. Ed. 2d 331 (1977)).

Trooper Thompson testified that he initially stopped the tractor-trailer for the purpose of conducting a traffic stop for a violation relating to failure to maintain lane

16

and to investigate whether the truck had bad tires and whether the driver was impaired. (Tr. at 6, 10, 38-39, 45). The legality of traffic stops is analyzed under the test set forth in <u>Terry</u>. "[A] traffic stop 'must last no longer than is necessary to effectuate the purpose of the stop.'" <u>United States v. Ramirez</u>, 476 F.3d 1231, 1237 (11th Cir. 2007) (quoting <u>United States v. Pruitt</u>, 174 F.2d 1215, 1220 (11th Cir. 1999)). Absent articulable suspicion of other criminal activity, a traffic stop may last no longer than necessary to process the traffic violation. <u>United States v. Purcell</u>, 236 F.3d 1274, 1277 (11th Cir. 2001). Additionally, "'further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter.'" <u>Ramirez</u>, 476 F.3d at 1237 (quoting <u>Pruitt</u>, 174 F.3d at 1220).

In <u>Hernandez</u>, 418 F.3d 1206, the Eleventh Circuit Court of Appeals, relying on the Supreme Court's decision in <u>Muehler v. Mena</u>, 544 U.S. 93, 125 S. Ct. 1465, 161 L. Ed. 2d 299 (2005), stated that the focus in evaluating the reasonableness of a detention during a traffic stop is "on the duration (and not scope of questioning)."[10]

_____

[10]The facts in <u>Muehler</u> involved the detention of an individual, Mena, in handcuffs during the execution of a search warrant. While Mena was being detained, officers questioned her about her immigration status. <u>Muehler</u>, 544 U.S. at 100-01, 125 S. Ct. at 1471. The Supreme Court rejected the lower court's finding that Mena's Fourth Amendment rights were violated by the questioning, a decision which the lower court apparently based "on the assumption that the officers were required to have independent reasonable suspicion in order to question Mena concerning her

17

Accordingly, a court does "not inquire as to the substantive reasonableness of the questions that are asked by a police officer in the context of a traffic stop, but only whether the 'duration' of the detention was prolonged 'for an unreasonable time.'" Ramirez, 476 F.3d at 1237 n.11 (quoting Hernandez, 418 F.3d at 1209 n.3); see also United Ffriend, 151 Fed. Appx. 778, 779 (11th Cir. 2005) ("Moreover, during a legal stop, an officer may ask questions, including questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license.").

The duration of a traffic stop may be prolonged to investigate, by the use of computer checks, the driver's license and the vehicle registration and, for officer's safety, the criminal history of the driver. United States v. Boyce, 351 F.3d 1102, 1106

---

immigration status because the questioning constituted a discrete Fourth Amendment event." Id. The Supreme Court found that premise faulty because, as summarized by the Eleventh Circuit Court of Appeals in Hernandez, "'[M]ere police questioning does not constitute a seizure,'" – even if such questioning is about a topic unrelated to the initial purpose of the search or seizure – so long as it does not "'prolong[ ] . . . the time reasonably required to complete that [initial] mission.'" 418 F.3d at 1209 n.3 (quoting Muehler, 544 U.S. at 101, 125 S. Ct. at 1471). The Supreme Court held that because the lower court did not find that questioning Mena about her immigration status extended the duration of her detention, "no additional Fourth Amendment justification for inquiring" about other matters was required. Muehler, 544 U.S. at 101, 125 S. Ct. at 1471. In Hernandez, the Court of Appeals extended the decision in Muehler to apply to lawful traffic stops. 418 F.3d at 1209 n.11.

(11th Cir. 2003)[11]; Purcell, 236 F.3d at 1277-78. Additionally, an officer conducting a routine traffic stop may request consent to search the vehicle. Purcell, 236 F.3d at 1281; United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999). And courts have determined that during routine traffic stops involving commercial tractor-trailers, as part of a normal field interview, officers may obtain and review the bill of lading and log book and other items related to the operation of the truck. See, e.g., United States v. Cantu, 227 Fed. Appx. 783, 785 (11th Cir. 2007) (because the defendant was stopped for crossing the line and officer had duty to investigate whether he was an impaired driver, examination of log book, was reasonable as part of traffic stop); United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1337 (N.D. Ga. 2009) (finding, as part of traffic stop, that officer was authorized to question the defendant "about his operation of the tractor-trailer, including asking to see his bill of lading and logbook"); Artiles-Martin, 2008 WL 2600787, at *8 (court found it was "perfectly appropriate to request the defendant to produce his driver's license, registration, insurance – and

_____

[11]However, each of these computer checks must be conducted as a routine part of the traffic stop and not undertaken after the conclusion of the traffic stop to further detain a driver absent articulable suspicion of other criminal activity. Boyce, 351 F.3d at 1107 (finding that the criminal history check in that case was not requested until several minutes after the traffic stop had concluded and after the officer had asked for and been refused consent to search the vehicle).

AO 72A
(Rev.8/82)

because this vehicle was a commercial truck – the driver's medical card and the driver's log book"); <u>United States v. Torres</u>, 2005 WL 3546677, at *5 (S.D. Ohio December 28, 2005) (officer conducting traffic stop of commercial truck properly requested and examined driver's license, log book and other documents concerning the truck and load being carried); <u>United States v. Dakers</u>, 2004 WL 5343936, at *5 (S.D. Ohio August 19, 2004) (officer properly requested driver to produce truck's log book and shipping papers as those documents were related to the defendant's travel plans).

The evidence presented at the evidentiary hearing establishes that Trooper Thompson had probable cause to conduct the traffic stop and that the traffic stop was reasonable in duration. On April 26, 2009, Trooper Thompson was parked on the side of I-85 northbound, at approximately mile marker 6. (Tr. at 4-6). As the Trooper observed northbound traffic, he saw a tractor-trailer which slowed as it passed him, and he heard a "thumping or pounding noise on the pavement" which, based on the Trooper's experience, was indicative of bad tires. (Tr. at 6, 10, 36, 60). The Trooper pulled out to follow the tractor-trailer in order to examine the tires closer, and as he did so, he "saw that he [i.e., the tractor-trailer,] was well over the fog line and come back." The Trooper testified that the failure to maintain lane was a violation of O.C.G.A. § 40-6-48. (Tr. at 6, 37-39). The Trooper turned on his video tape in the patrol vehicle

20

and observed the that the truck "went over the fog line again and came back, and then kind of rode the fog line." (Tr. at 6, 39-41). He therefore decided to conduct a traffic stop for failing to maintain lane and to investigate the suspected bad tires and, because of the early morning hours, whether the tractor-trailer driver was impaired. (Tr. at 6, 10, 42). At approximately 1:15-1:20 into the video, Trooper Thompson turned on his blue lights to effect the traffic stop. (Tr. at 9). The tractor-trailer stopped at approximately 1:40 on the video tape. (Tr. at 9).

The Georgia Code provides in pertinent part in § 40-6-48:

Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules, in addition to all others consistent with this Code section, shall apply:

(1) A vehicle shall be driven as nearly as practicable within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety. . . .

O.C.G.A. 40-6-48. Accordingly, failure to maintain lane is a traffic offense in the State of Georgia. See United States v. $175, 722.77, 307 Fed. Appx. 257, 259 (11th Cir. 2007). And weaving out the lane of traffic, including over the fog line, provides a basis for a traffic stop. See United States v. Baugh, 71 F. Supp. 2d 1375, 1377 (M.D. Ga. 1999); Ivey v. State, 301 Ga. App. 796, 689 S.E.2d 100 (2009); Camacho v. State, 292 Ga. App. 120, 121-22, 663 S.E.2d 364, 366 (2008). The Trooper was correct in

21

determining that he had observed a violation of failure to maintain lane. Additionally, such erratic driving, especially due to the early morning hour, provided the Trooper with a reasonable basis for conducting a stop to determine if the driver of the tractor-trailer was impaired. See Baugh, 71 F. Supp. 2d at 1377; Ivey, 301 Ga. App. at 797-98, 689 S.E.2d at 101-02.

The Trooper was also authorized to conduct a traffic stop to determine if the tractor-trailer was operating in violation of § 40-8-74. See Woodard v. State, 289 Ga. App. 643, 646-47, 658 S.E.2d 129, 133 (2008) ("[T]he agent was authorized to initially detain the van and its occupants and require them to pull over to the shoulder based on his observation that the tires of the van lacked proper tread and his decision to issue a warning for that violation of state law. See OCGA § 40-8-74(a) ('No vehicle equipped with solid rubber tires shall be used or transported upon the highways, unless every solid rubber tire on such vehicle shall have rubber on its entire traction surface at least one inch thick above the edge of the flange on the tire periphery.')"). And examination of the tires, after the tractor-trailer was stopped, confirmed the Trooper's belief that the tires did not conform to the statutory requirements. (Tr. at 18, 59-60; Gov't Ex. 6).

Once the Trooper stopped the tractor-trailer, the duration of the stop, which lasted approximately twenty-four to twenty-five minutes was reasonable. The tractor-trailer stopped at approximately 1:40 on the video tape. (Tr. at 9). The Trooper stopped his patrol vehicle behind the tractor-trailer and exited the vehicle, walking up to the cab of the truck on the passenger side. (Tr. at 9). The Trooper spoke to Defendant Martinez first asking if anyone else was in the truck, and Defendant responded, no. (Tr. at 9). The Trooper then asked if he could step up on the running board to speak with Defendant; after Defendant agreed, the Trooper asked Defendant for his driver's license, which was a Texas driver's license, and for the truck's paperwork, which included registration and insurance. (Tr. at 9). As he obtained the papers, the Trooper asked Defendant about his trip, and Defendant responded that he had just left exit 1 where he had been for nine hours. (Tr. at 9). The Trooper explained to Defendant that he had stopped him for the bad tires and failing to maintain lane and asked Defendant for his log book and bill of lading, which he obtains as part of his normal field interview. (Tr. at 9-10, 61). After obtaining the documents from Defendant, the Trooper walked with Defendant to the back of the trailer where he pointed out the problems with the tires which showed gaps and wearing of the tread. (Tr. at 17-18, 44-45, 59-60; Gov't Ex. 6). The Trooper then asked Defendant if he had

23

been drinking or was on medication to determine if he was impaired and, based on his conversation with Defendant and observing his speech and eyes, decided that Defendant was not impaired. (Tr. at 18, 44). At approximately 8:30 on the video tape and continuing until approximately 20:23 on the video tape, as part of his normal field interview, the Trooper entered the patrol vehicle to run computer checks on Defendant and to examine the paperwork provided by Defendant. (Tr. at 18).

After completing the computer checks and examination of the documents, the Trooper exited the patrol vehicle and spoke with Defendant. As he was writing a warning to issue to Defendant, at approximately twenty minutes into the traffic stop, the Trooper noticed that Defendant was fidgeting and sweating, although the Trooper stated that it was cool and he was wearing a jacket. And Defendant was rubbing his face and coughing, claiming that the bugs were bad, although the Trooper was not bitten or bothered by any bugs. (Tr. at 19-20, 49, 61). As he was completing the warning, the Trooper asked Defendant if there was marijuana or cocaine in the truck. (Tr. at 20, 45-46). Before answering, Defendant glanced down. (Tr. at 20, 61). At approximately twenty-four minutes into the traffic stop, the Trooper handed the warning and all of the other paperwork back to Defendant, ending the traffic stop. (Tr. at 20, 45-46).

24

None of the actions taken by the Trooper unreasonably lengthened the traffic stop, including questioning Defendant about his travel, determining why he was driving erratically, conducting computer checks on the driver, and examining the log book and bill of lading.  See, e.g., United States v. Geboyan, 2010 WL 653342, at *1 (11th Cir. February 24, 2010) (traffic stop of approximately twenty minutes, including time officer conducted computer checks on driver and passengers, was reasonable); Cantu, 227 Fed. Appx. at 785 (traffic stop lasting approximately twenty-seven minutes, which included examination of the log book, to determine how long driver had been driving, was reasonable); Artiles-Martin, 2008 WL 2600787, at *10 (noting that "police are not constitutionally required to move at top speed or as fast as possible[,]" the court determined that the "twenty-five minutes between the stop and the discovery of probable cause to conduct a search, is well within the range of time periods that the Eleventh Circuit has found to be constitutionally permissible"); Dakers, 2004 WL 5343936, at *5 (noting that officer did not devote himself exclusively to task of completing the ticket for the lane violation, but also examined the log book and shipping documents, the court held that traffic stop of approximately twenty minutes was reasonable).

25

Furthermore, any delay in completing the traffic stop as well as the continued detention of Defendant following the traffic stop to examine the fuel receipts and to ask for consent to search was based on a reasonable suspicion that Defendant was engaged in criminal activity and was of a reasonable duration.[12] Based on the Trooper's training, which included over 100 hours of specialized training involving criminal interdiction of drug trafficking, such as, location of hidden compartments,

---

[12]The court will assume, as did Defendant and the Government, that once the traffic stop was completed, that is, when Defendant was handed the warning and all of his documents were returned, Defendant was further detained by the Trooper. However, as noted *supra*, "'further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter.'" Ramirez, 476 F.3d at 1237 (citation omitted). The evidence presented in this case establishes a basis for finding that Defendant was not being detained, thus, his Fourth Amendment rights were not implicated during the questioning about the fuel receipts and while being asked for consent to search. The traffic stop had ended. The Trooper handed Defendant the warning and all of his personal papers and the documents related to operation of the truck. (Tr. at 19-20, 46). The entire stop had been conducted in a low-key and cooperative manner. Nothing objectively prevented Defendant from declining to speak with or cooperate with the Trooper and getting in the truck and leaving. Id. at 1240 (noting that while there is no "bright-line 'litmus test'" to determine if a defendant is detained or engaged in a consensual encounter following a traffic stop, several factors were identified by the court to assist in making a decision, "such as whether there is any coerciveness on the part of the police, whether the exchange is cooperative in nature, and whether the defendant had everything he reasonably required to proceed on his journey"); see also Geboyan, 2010 WL 653342, at *2 (at the time the officer requested consent to search, the traffic stop had ended and the officer had returned to the defendant all of her paperwork, therefore, the exchange was cooperative in nature).

AO 72A
(Rev.8/82)

drug transactions, and drug interdiction programs offered by federal law enforcement agencies (Tr. at 5), and experience, which included about eight years as a POST certified GSP Trooper enforcing the criminal and traffic laws and previously as a Deputy Sheriff with the Fayette County Sheriff's Office with duties including patrol and in the narcotics division (Tr. at 4, 33), he developed a reasonable suspicion that Defendant was engaged in criminal activity. See Lindsey, 482 F.3d at 1290-91 ("We also recognize that the police may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might elude an untrained person.'") (citation omitted); United States v. Smith, 201 F.3d 1317, 1323 (11th Cir. 2000) ("In deciding whether the detaining officers had reasonable suspicion, we look at the totality of the circumstances known to the detaining officers at the time of the detention[,]" which includes viewing all of the circumstances "in the light of the officers' special training and experience.").

Trooper Thompson outlined, based on his training and experience, the particular facts that caused him to be suspicious that the tractor-trailer was not carrying a legitimate load. As he walked up to the truck, after exiting his patrol vehicle, the Trooper noticed that the trailer was not sealed which caused him to question whether the truck was engaged in a legitimate enterprise. (Tr. at 10-11). He stated that based

27

on his experience as a Trooper and operating a trucking business, he knew that trailers typically were sealed to prevent tampering with the load. (Tr. at 11, 61). Once seated in the patrol vehicle, while the computer checks were being completed, the Trooper examined the bill of lading provided by Defendant, and he noted that Defendant had picked-up a load of produce in McAllen, Texas, on April 23, 2009, destined for All Seasons Produce, in North Carolina. (Tr. at 12; Gov't Ex. 2). The bill of lading was handwritten, not computer generated, which was not consistent with the majority of such documents examined by him during his experience as a Trooper in stopping numerous trucks nor with his training as a law enforcement officer. (Tr. at 12-14, 34-35, 61). He also noted the delay in transporting the produce, that is, that three days had passed since picking up the load of perishable commodities, the fact that the load was marked "paid," and that there was no specific delivery address. All of this information was inconsistent with bills of lading he had examined for legitimate commercial trucking business enterprises and based on his experience in stopping other trucks, causing his suspicions to increase about the legitimacy of the load being transported by Defendant. (Tr. at 14-15, 35, 47-48, 61). And the Trooper examined the log book provided by Defendant and noticed that it was not current, the last entry being April 25, 2009, when Defendant explained that he entered on duty. (Tr. at 15-16; Gov't Ex.

3). The unexplained time in the log book, no indication of reasons therein for travel delay, and the travel back and forth all raised the Trooper's suspicions based on his law enforcement training and experience. (Tr. at 16-17, 61-62).

And, once the Trooper exited the patrol vehicle to speak with Defendant and to prepare and issue the warning, he observed that Defendant was fidgeting and sweating, although the Trooper stated that it was cool and he was wearing a jacket. And Defendant was rubbing his face and coughing, claiming that the bugs were bad, although the Trooper was not bitten or bothered by any bugs. All of this conduct by Defendant was considered nervous behavior by the Trooper. (Tr. at 19-20, 49, 61). As he was completing the warning, the Trooper asked Defendant if there was marijuana or cocaine in the truck. (Tr. at 20, 45-46). Before answering, Defendant glanced down, and, because he had looked the Trooper in the eye when answering other questions, the Trooper said this added to his suspicions. (Tr. at 20, 61). All of these factors, beginning with the lack of a seal on the trailer, in light of the Trooper's training and experience, established reasonable suspicion to continue the interview to investigate whether Defendant was engaged in other criminal conduct. Similar factors have been determined by other courts to establish reasonable suspicion.

In <u>United States v. Arango-Lopez</u>, 340 Fed. Appx. 154 (4th Cir. 2009), the Fourth Circuit Court of Appeals considering the challenge to a traffic stop involving a commercial truck for speeding found that the officer's suspicion of criminal activity, based on examination of the documents relating to the truck's operation and the defendant's actions, was reasonable. The court, relying on the officer's opinion about why he questioned the legitimacy of the truck's operation, found that the defendant's extreme nervousness, inconsistencies in the log book and bill of lading, the unexplained delay in transporting the load, and the circuitous route taken to deliver the load established a reasonable suspicion of criminal activity. <u>Id.</u> at 155-56. Likewise, in <u>United States v. Johnson</u>, 285 F.3d 744 (8th Cir. 2002), the Eighth Circuit Court of Appeals found that the officer had a reasonable suspicion to continue the detention of a commercial truck based on the incomplete log book entries, confusion as to final destination, incomplete address on bill of lading, truck's delay in transportation especially in light of fact hauling produce, and the defendant's evasive and strange conduct, as well as the facts that the defendant's criminal history involved drugs and that his trip included a plane flight which seemed a costly expense. <u>Id.</u> at 749. In <u>United States v. Flores</u>, 2009 WL 2170238 (M.D. Ala. July 20, 2009), the District Court found that the officer assembled reasonable suspicion of criminal activity after

he stopped a commercial truck for a traffic violation. The log book showed two months of inactivity, which the defendant claimed was due to unavailability of a load, although the officer's information indicated that loads were readily available from Texas. The point of origin for the load was a source area for drugs. Also, the amenities on the truck seemed inconsistent with the defendant's lack of work. The Court concluded that officer's review of the log, "coupled with his knowledge of the drug and trucking industries," provided the basis to extend the stop. And, in <u>Dakers</u>, although the District Court found that the duration of the stop was reasonably related to issuance of the traffic citation, the Court also found that the officer had reasonable suspicion to suspect that the defendant was engaged in other criminal activity to extend the duration of the stop. The facts considered by the Court included the nature of and delay in the defendant's travel, the manner in which the shipping papers were completed, that is, with cross-outs and handwriting, which the officer testified as not the norm, the high number on the trailer, indicating ownership by a new company using letters rather than a name, which the officer testified was common for companies transporting drugs, and the defendant's nervousness and failure to make eye-contact. <u>Id.</u> at 4 n.11.

AO 72A
(Rev.8/82)

Given this case law, the court finds that in the present case the continued detention of Defendant did not violate his Fourth Amendment rights. The Trooper requested to see the fuel receipts for the purpose of helping to explain the gaps in the log book. (Tr. at 21). The Trooper testified that the request to examine the fuel receipts was in furtherance of his investigation of the other suspicious activity and that he hoped the fuel tickets would shed some light on Defendant's activities that day and explain the delay in his travel. (Tr. at 46-48). Defendant agreed to the request and went to retrieve the fuel receipts but was locked out of the cab of the truck. The Trooper loaned Defendant pliers, and after approximately seven minutes, Defendant was able to enter the cab and obtain the receipts which he provided to the Trooper. (Tr. at 21). The Trooper returned the receipts and, at approximately 32:50 on the video tape, asked Defendant if he could search the trailer. Defendant replied, "Yes, sir." (Tr. at 22, 49). This brief delay to conduct a further investigation, most of which was attributable to Defendant's inability to enter his truck, and to determine whether Defendant would consent to a search was not unreasonable. Once Defendant consented to the search, the encounter became consensual and the amount of delay, because Defendant did not object to the length or scope of the search, is not considered by the court. See United States v. Gonzalez, 275 Fed. Appx. 930, 933 (11th Cir. 2008)

32

(once "driver voluntarily consents to a search of his vehicle, 'the reminder of the detention [is] consensual so long as the scope of the search [does] not exceed the consent given[;]'" therefore, "where the driver raises no issue concerning the scope or duration of the search, only the time period between the initial stop and the driver's consent is relevant to the reasonableness of the duration of the traffic stop.") (quoting Purcell, 236 F.3d at 1279).

For these reasons, the court finds that the Trooper had probable cause to conduct the traffic stop which was of a reasonable duration and had a reasonable suspicion of criminal activity to briefly extend the stop. Defendant was not unlawfully detained at the time that he was asked for consent to search the tractor-trailer.

### b.    Consent Search

Defendant next contends that he did not voluntarily consent to a search of the tractor-trailer arguing that, in addition to the fact he was being unlawfully detained and did not voluntarily consent, the Trooper altered the consent to search form after Defendant signed it to add the trailer as part of the search. [Doc. 48 at 7, 10-12]. First, there is no evidence before this court to support Defendant's argument that Trooper Thompson altered the consent to search form after it was signed by Defendant. The court rejects that argument as groundless. The court has also determined that

33

Defendant was not being unlawfully detained at the time of the consent. The court will therefore to turn to the question of whether Defendant voluntarily consented to the search.

"It has been long recognized that police officers, possessing neither reasonable suspicion nor probable cause, may nonetheless search an individual without a warrant so long as they first obtain the voluntary consent of the individual in question." United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)). "Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances." Blake, 888 F.2d at 798 (citing Schneckloth, 412 U.S. at 249-50, 93 S. Ct. at 2059); see also United States v. Nuyens, 17 F. Supp. 2d 1303, 1306 (M.D. Fla. 1998) ("Voluntariness of consent is a question of fact, and the Court must look to the totality of the circumstances."). "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." Blake, 888 F.2d at 798 (citing United States v. Massell, 823 F.2d 1503, 1507 (11th Cir. 1987)); see also Purcell, 236 F.3d at 1281 ("A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and

34

unconstrained choice.'") (citation omitted). Factors in assessing voluntariness include: "voluntariness of defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found." Blake, 888 F.2d at 798 (citations omitted); see also Purcell, 236 F.3d at 1281 (same).

However, "the government need not establish [defendant's] knowledge of the right to refuse consent 'as the *sine qua non* of effective consent.'" United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting Ohio v. Robinette, 519 U.S. 33, 39, 117 S. Ct. 417, 421, 136 L. Ed. 2d 374 (1996)). And, contrasting the test for the waiver of "rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment," Schneckloth, 412 U.S. at 241, 93 S. Ct. at 2055, the Supreme Court explained that, while a consent to search must be voluntary, it need not be "'an intentional relinquishment or abandonment of a known right or privilege,'" that is, knowing and intelligent. Id. at 241-46, 93 S. Ct. at 2055-56 (citation omitted); see also Tukes v. Dugger, 911 F.2d 508, 516 (11th Cir. 1990) (same). According to the former Fifth Circuit in United States v. Elrod, 441 F.2d 353 (5th Cir. 1971), a case decided

35

before <u>Schneckloth</u>, "[t]he question [whether an individual has validly consented to a search] is one of mental awareness so that the act of consent was the consensual act of one who knew what he was doing and had a reasonable appreciation of the nature and significance of his actions." <u>Id.</u> at 355. Nonetheless, that standard does not, after <u>Schneckloth</u>, mean that a voluntary consent to search requires a comprehension of Fourth Amendment rights. <u>United States v. Jennings</u>, 491 F. Supp. 2d 1072, 1078-79 & n.3 (M.D. Ala. 2007). Based on the evidence before this court, the court finds that Defendant voluntarily consented to a search of the tractor and trailer.

After Defendant verbally agreed to a search of the tractor-trailer, the Trooper filled out the consent form completely, including identifying the trailer as being part of the consent to search, before handing it to Defendant to read. (Tr. at 23, 50-51). The Trooper explained the form to Defendant and asked Defendant to read the form. He stated to Defendant that, if he agreed to the search, to sign the form but if not, not to sign the form. The Trooper stated that he made sure Defendant understood that he did not have to sign the form. (Tr. at 23-25, 51-52). The form stated:

GEORGIA STATE PATROL
CONSENT TO SEARCH

I, *Rolando Martinez* hereby grant my consent to *Thompson, Morris, Mitchell* Troopers of the Georgia State Patrol to search the following

described vehicle including luggage, containers, and contents of all. This includes the removal of any suspicious paneling or other vehicle components and the least intrusive access to any constructed compartment used for the purposes of concealing contraband.

| Color | Year | Make | Body Style | License Number |
|-------|------|------|-----------|----------------|
| *White* | ~~*White*~~ | | *Trailer* | *Y23872 (Tx)* |
| *Red* | *2003* | *Freightliner* | *Tractor* | *RF2N83 (Tx)* |

I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form. I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to this form.

My consent to search is freely and voluntarily given.

Date *4-26-08*          Time *0655*

*Rolando Martinez*
Signature

(Tr. at 24; Gov't Ex. 4) (italics indicates information added to typewritten form). The Trooper asked Defendant if he had observed the trailer being loaded, and Defendant responded, yes. (Tr. at 26). Then he asked Defendant if there was anything illegal in the trailer, and Defendant responded, no. (Tr. at 26). After examining the form, for approximately thirteen seconds, Defendant signed the form. (Tr. at 23, 26, 52).

As noted, Defendant was lawfully detained at the time of the consent, and while actually reviewing and completing the consent form, the encounter was consensual. Defendant had been and continued to be cooperative with the Trooper, whose conduct

37

was not coercive. Importantly, Defendant was aware that he did not have to consent to the search and simply could refuse to sign the form. Defendant appeared to be able to communicate with the Trooper and appeared to understand. All of these factors indicate that Defendant's consent was voluntary. After the consent form was signed, the Trooper conducted a search of the trailer and eventually located a quantity of marijuana secreted in a box of peppers. (Tr. at 27-31, 52-56). There is no evidence in the record that Defendant objected to the scope of the consent or amount of time required to conduct the search of the trailer. Following the discovery of marijuana, the Trooper placed Defendant under arrest and relocated Defendant and the tractor-trailer to a nearby WalMart Distribution Center to be off-loaded. (Tr. at 30-32, 57).

Based on these facts, the court finds that Defendant voluntarily consented to a search of the tractor-trailer which resulted in the seizure of the marijuana and the other documents relating to the truck's commercial operation.

### c.    Probable Cause for Arrest

Because the Trooper lacked direct evidence that Defendant was aware of the contents of the trailer, Defendant also asserts that the Trooper did not have probable cause for his arrest. [Doc. 48 at 8]. However, based on the totality of the circumstances and the reasonable inferences drawn from those circumstances, the court

AO 72A
(Rev.8/82)

finds that Trooper Thompson did have probable cause to arrest Defendant for drug trafficking.

In <u>Craig v. Singletary</u>, 127 F.3d 1030 (11th Cir. 1997), the Eleventh Circuit Court of Appeals stated:

> Probable cause to arrest exists when the facts and circumstances within the collective knowledge of law enforcement officers, or of which they have reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed or is committing an offense. . . . Because "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment" . . . "probable cause itself is a doctrine of reasonable probability and not certainty."

<u>Id.</u> at 1042 (citations omitted); <u>see also</u> <u>Lindsey</u>, 482 F.3d at 1291 ("Probable cause to arrest exist when the totality of the facts and circumstances support 'a reasonable belief that the suspect had committed or was committing a crime.'") (citation omitted). Thus, "[s]ince a finding of probable cause requires only a probability of criminal activity . . . a court assessing probable cause in hindsight must assess both the totality of the circumstances and the inferences that flow from those circumstances." <u>United States v. Wai-Keung</u>, 845 F. Supp. 1548, 1557 (S.D. Fla. 1994), <u>aff'd</u>, 115 F.3d 874 (11th Cir. 1997) (citations omitted). Finally, probable cause "must be judged not with clinical detachment, but with a common sense view to the realities of normal life." <u>Craig</u>, 127 F.3d at 1042.

39

In addition to the factors known to Trooper Thompson that established a reasonable suspicion to believe Defendant was engaged in an illicit enterprise not legitimate trucking, he knew that Defendant was placed in the possession of controlled substances, in an unsealed trailer providing Defendant ready access. Defendant also admitted observing the trailer being loaded. Additionally, Defendant was in sole possession of the drugs, which was illegal merchandise of considerable value, and a reasonable inference drawn from that fact is that neither the distributor nor recipient of the marijuana would trust the drugs to an unknowing transporter.

In <u>United States v. Dickey-Bey</u>, 393 F.3d 449 (4th Cir. 2004), the Fourth Circuit Court of Appeals found probable cause existed to arrest an individual who picked up a sealed package containing a quantity of cocaine from a mail delivery location although there was no direct evidence of the arrestee's knowledge of the contents of the package. The court focused on the totality of the circumstances involving a series of transactions to ship quantities of cocaine to various mail delivery locations and to subsequently deliver the packages to another site. <u>Id.</u> at 454-55. Inferring knowledge of the contents of the package to the arrestee to support a finding of probable cause, the court stated:

40

These facts suggest the existence of a careful and clever operation dealing in large quantities of cocaine. *In assessing probabilities*, an experienced officer would conclude that the person designated to pick up the packages was likewise part of the well-planned operation. It would have made little sense for a large, sophisticated operation to go to the lengths and organization demonstrated in this case and then casually to commit the pickup of some $200,000 worth of drugs to an unknown, uninformed, and perhaps untrustworthy courier. To the contrary, such an operation would likely have sent someone known to be trustworthy to pick up the packages. . . .

Id. at 455 (emphasis in original). Similarly, in United States v. Frazier, 394 F.3d 612 (8th Cir. 2005), the Eighth Circuit Court of Appeals found sufficient evidence to support the conviction of an individual transporting a large quantity of pseudoephedrine although there was no direct evidence of the defendant's knowledge of the contents of the U-Haul truck used to the transport the precursor. Id. at 620-21. The court noted that "[e]ven if [the defendant] did not own the U-Haul or the contents being transported, it is unlikely that the owner would place such a significant amount of pseudoephedrine in the hands of people who do not know it is there." Id. at 621; see also Kilgore v. The City of Stroud, Oklahoma, 2004 WL 2203477, *4 (W.D. Okla. August 16, 2004) (noting that it was unlikely that the owner of the precursor chemicals and other items would allow an innocent person to observe the illicit conduct, the court stated, "If Mr. Kilgore were innocent, Mr. Lewis' allowing Mr. Kilgore to observe

what he did and to have access to the items he did would be unusual because Mr. Kilgore would then be able to furnish evidence against Mr. Lewis regarding the purchase and possession of the pseudoephedrine and the needles and syringes.").

For these reasons, the court finds that there was probable cause to arrest Defendant; therefore, his subsequent statements were not tainted by an unlawful arrest.

### d. Post-Arrest Statements

Although Defendant does not address the validity of his waiver of the <u>Miranda</u> rights with respect to his post-arrest statements in his brief in support of his motion to suppress, the court will briefly review the evidence surrounding the <u>Miranda</u> warnings and Defendant's waiver. The Government contends that Defendant knowingly, intelligently and voluntarily waived his rights. [Doc. 49 at 24-25]. The court agrees.

<u>Miranda</u> "'warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation.'"[13] <u>United States v. Adams</u>, 1 F.3d 1566, 1575 (11th Cir. 1993) (quoting <u>Endress v. Dugger</u>, 880 F.2d 1244, 1248 (11th Cir. 1989)). Defendant was in custody on April 26, 2009, having been arrested by Trooper Thompson. Therefore, the first question that

---

[13]<u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 478, 86 S. Ct. 1602, 1630, 16 L. Ed. 2d 694 (1966).

42

the court must answer is whether Defendant was advised of his <u>Miranda</u> rights.  <u>See</u> <u>United States v. Barbour</u>, 70 F.3d 580, 585 (11th Cir. 1995) ("The threshold inquiry is whether [defendant] was informed of his Miranda rights.").  In reaching this answer, the Supreme Court stated that it "has never indicated that the 'rigidity' of <u>Miranda</u> extends to the precise formulation of the warnings given a criminal defendant" and that "no talismanic incantation [is] required to satisfy its strictures." <u>California v. Prysock</u>, 453 U.S. 355, 359, 101 S. Ct. 2806, 2809, 69 L. Ed. 2d 696 (1981).

While the tractor-trailer was being off-loaded at the WalMart Distribution Center, TFAs Gordon and Best arrived at approximately 10:00 a.m.  (Tr. at 64-66). They observed Defendant, who was not handcuffed, sitting near the rear of the trailer and spoke briefly with the Troopers while examining the paperwork and items found in the tractor-trailer.  (Tr. at 66).  The TFAs then spoke with Defendant, identifying themselves and determining whether Defendant spoke English.  (Tr. at 66-67). Defendant indicated that he had attended school in the United States and, although he spoke Spanish, preferred to converse in English.  (Tr. at 67).  He did not appear to be under the influence and was a little nervous but calm.  (Tr. at 67).  The TFAs were armed, but their weapons were concealed.  (Tr. at 73).

AO 72A
(Rev.8/82)

Using a DEA 13-A card, TFA Gordon read Defendant <u>Miranda</u> rights, stating,

> Before we ask you any questions, you must understand:
> - You  have the right to remain silent.
> - Anything you say can be used against you in court.
> - You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.
> - If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> Do you understand?
> Are you willing to answer some questions?

(Tr. at 67-69; Gov't Ex. 7).  Defendant stated that he understood his rights and agreed to answer questions.  (Tr. at 67, 69).  Defendant remained seated during the twenty to twenty-five minute interview and remained un-handcuffed.  When he stated he was thirsty, TFA Gordon gave him a soft drink.  (Tr. at 69-70).  Defendant was advised of his rights.

Having found that Defendant was advised of his <u>Miranda</u> rights, the court must next determine whether Defendant voluntarily, knowingly and intelligently waived those rights.[14]  <u>See</u> <u>Barbour</u>, 70 F.3d at 585.  This is a two-part inquiry:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than

---

[14]"It is well established that '[t]he government must prove by a preponderance of the evidence that [the defendant] made a knowing, voluntary and intelligent waiver of <u>Miranda</u> rights.'"  <u>United States v. Chirinos</u>, 112 F.3d 1089, 1102 (11th Cir. 1997) (citation omitted).

AO 72A
(Rev.8/82)

intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived.

<u>Id.</u> (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410 (1986)) (internal citations omitted). The totality of all the surrounding circumstances, which a court must evaluate to make these determinations, includes "both the characteristics of the accused and the details of the interrogation." <u>Schneckloth</u>, 412 U.S. at 226, 93 S. Ct. at 2047. No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances. <u>See</u> <u>Moore v. Dugger</u>, 856 F.2d 129, 134 (11th Cir. 1988). Defendant did knowingly, intentionally and voluntarily waive his rights.

As just noted, Defendant was seated, unrestrained at the WalMart Distribution Center, apparently in control of his faculties, when advised of his rights. (Tr. at 66-67). The TFAs determined that Defendant was educated in the United States and preferred to converse in English. (Tr. at 67). The agents did not have weapons drawn, and there is no evidence that any coercive conduct was used to obtain the waiver. (Tr.

45

at 73).  When he asked, Defendant was given a drink.  (Tr. at 69-70).  Defendant stated that he understood his rights, and nothing in the record leads to a contrary conclusion.  (Tr. at 67, 69).  And, the next day during processing, nothing in the record indicates that Defendant's statements were coerced or involuntary.

Defendant stated that he wanted to talk with TFA Gordon.   (Tr. at 71).  Defendant was not physically restrained and was very cooperative, and the agents were not armed.  (Tr. at 73).  TFA Gordon advised Defendant to remember the rights read to him the day before and that those rights still applied to him.  (Tr. at 71).  Defendant stated that he had not been allowed to use the telephone to call his son and stated that he wanted to cooperate.  He asked what was needed.  The TFA responded, "We need the truth."  (Tr. at 71).  The TFA did not use any coercion, and Defendant spoke with him voluntarily.  Defendant stated, "You guys have treated me well, I need to figure out what happened.  I want to help you guys."  (Tr. at 71).  Because Defendant was hesitating, TFA Gordon stated to Defendant that the charges were serious and that he needed to speak with a lawyer first and stopped Defendant from speaking with him.  (Tr. at 71).   Defendant was advised that his rights still applied and volunteered statements to the agents.  TFA Gordon, in fact, decided to terminate the interview to ensure that Defendant had the advice of counsel before proceeding.

46

Based on the totality of the circumstances, the court finds that Defendant was advised of his Miranda rights and knowingly, intelligently and voluntarily waived his rights; therefore, his post-arrest statements are admissible.

## III.    Conclusion

For the foregoing reasons and based on the cited legal authority, the court **RECOMMENDS** that Defendant's motion [Doc. 39] to suppress be **DENIED**.

## Motion to Strike Testimony

Finally, Defendant moved, within the brief in support of the motion to suppress [Doc. 48 at 9-10], to strike the testimony of Trooper Thompson contending that he was unqualified to provide the opinions based on his training and experience as a law enforcement officer and alleging, without foundation, that the Trooper "intentionally misled the Court[.]"  [Id.].  As the court noted at the hearing, when Defendant's counsel objected to the testimony, Trooper Thompson's testimony was not being admitted under Fed. R. Evid. 702, but as a layperson, particularly a law enforcement officer, with training and experience and based on the significance of the facts noted, if any, to the Trooper in his law enforcement capacity.  (Tr. at 10, 13-15).  The Trooper's background in trucking, while providing some additional basis for his opinions about the legitimacy of Defendant's enterprise, was not as significant to the

47

court as his extensive law enforcement training and experience as a Trooper interacting with numerous commercial trucking enterprises over the course of his career.

And, as evidenced by the cases cited by the court in ruling on the motion to suppress, the testimony offered by Trooper Thompson falls within the scope of the law-enforcement-based opinion evidence relied on by courts to resolve issues of reasonable suspicion in these type of cases. See, e.g., Johnson, 285 F.3d at 749; Arango-Lopez, 340 Fed. Appx. at 155-56; Flores, 2009 WL 2170238, at *6; Dakers, 2004 WL 5343936, at *4 n.11.[15] The court finds that, as to the opinion evidence relied on by the court in resolving the motion to suppress in this case, Trooper Thompson's training and experience sufficiently provided a basis for the opinions he offered at the evidentiary hearing.

---

[15]Likewise, in cases determining whether there is probable cause for an arrest or to issue a search warrant, it is well-established that courts may rely on the type of opinion evidence, based on a law enforcement officer's training and experience, as offered at the evidentiary hearing in this case. See United States v. Whitner, 219 F.3d 289 (3rd Cir. 2000); United States v. Feliz, 182 F.3d 82 (1st Cir. 1999); United States v. Robinson, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995); United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995); United States v. Pitts, 6 F.3d 1366 (9th Cir. 1993); United States v. Thomas, 989 F.2d 1252 (D.C. Cir. 1993); United States v. Williams, 974 F.2d 480 (4th Cir. 1992); United States v. Espinosa-Orlando, 704 F.2d 507, 511 (11th Cir. 1983).

AO 72A
(Rev.8/82)

For these reasons, the court **DENIES** the motion [Doc. 48] to strike that testimony.

### Conclusion

For the foregoing reasons and stated authority, the court **RECOMMENDS** that Defendant's motion [Doc. 39] to suppress be **DENIED** and **ORDERS** that Defendant's motion [Doc. 48] to strike the testimony of Trooper Thompson be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**IT IS SO RECOMMENDED AND ORDERED** this 21st day of April, 2010.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

49