**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**ROLANDO MARTINEZ,**<br><br>Defendant. | Case No. 3:09-CR-5 |

### ORDER

Currently before the Court is Defendant's Motion to Dismiss or in the Alternative, Plea in Bar of Former Jeopardy (Doc. 93). The Motion to Dismiss is denied.

**I.   BACKGROUND**

Defendant is charged with one count of possession with intent to distribute at least one thousand kilograms of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vii). The case against Defendant was first tried to a jury beginning on September 27, 2010 before then-federal judge Jack T. Camp Jr. Evidence was presented by the Government on September 27 and 28, 2010. At the end of the Government's case, Defendant moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal, arguing that the Government failed to present the court with evidence that he knowingly and intentionally possessed with the intent to distribute the marijuana in question. (Trial Tr. vol. 2, pp. 190-91, Sept. 28, 2010). After hearing argument from both sides, Camp overruled the motion.

(Trial Tr. vol. 2, pp. 201-02). Defendant then testified in his own defense (Trial Tr. vol. 2, pp. 203-61), and the Government presented a rebuttal witness (Trial Tr. vol. 2, pp. 262-73). The evidence was then closed, and Defendant renewed his Rule 29 motion. Camp again overruled the motion. (Trial Tr. vol. 2, p. 274).

Camp charged the jury on the law applicable to the case and gave the case to the jury at approximately 3:15 p.m. on September 28, 2010. (Trial Tr. vol. 2, p. 324). The jury deliberated until approximately 5:05 p.m. on September 28, when Camp released them for the day. (Trial Tr. vol. 2, pp. 324-25).

The jury returned for further deliberations at 9:30 a.m. on September 29, 2010. The jury deliberated until approximately 12:15 p.m., when they were released for lunch. (Trial Tr. vol. 3, p. 328). The deliberations resumed at 1:30 p.m., and the jury sent a note to the court at approximately 2:42 p.m., stating that they were deadlocked. (Trial Tr. vol. 3, p. 329; Doc. 73, p. 3). Camp asked counsel for their positions on the note, and counsel agreed that an Allen charge would be appropriate. (Trial Tr. vol. 3, p. 329). Counsel for Defendant inquired of Camp how long he expected the jury to deliberate afterwards. Camp stated that

> [w]e will go the rest of today, and since it's already almost 2:45, I think I will have them come back tomorrow. And then sometime tomorrow, if they don't make any progress, probably tomorrow morning, if they haven't made any progress, we will excuse them. I won't tell them that, but that is sort of what I was thinking an appropriate schedule would be.

(Trial Tr. vol. 3, pp. 329-30). There was no objection from counsel to that proposal. (Trial Tr. vol. 3, p. 330).

The jury was brought into the courtroom, where the foreperson stated that they were not making any progress in their deliberations. Camp gave an Allen charge, and the jury resumed their deliberations at 3:05 p.m. (Trial Tr. vol. 3, pp. 330-33). At that time, Camp remarked to counsel, "Well, nobody looked very optimistic, but we'll see what happens and bring them back maybe a little before 5:00 today, because they've been working pretty hard all day." (Trial Tr. vol. 3, p. 333). The jury returned to the courtroom at 4:45 p.m., where the foreperson again stated that no progress was being made. (Id.) Camp released the jury for the day, with instructions to return on September 30 at 9:30 a.m. (Trial Tr. vol. 3, p. 334).

After the jury left for the day, Camp stated to counsel, "Well, they didn't appear to be happy campers. Do you have any conflicts on Friday?" (Id.) Counsel for Defendant stated that he had several emergency motions to prepare for foreclosure defendants for the following Tuesday. Camp responded that he

> was kidding about Friday. . . .Really, what I would plan to do is, after they let it settle tonight, which I have found often breaks the deadlock with a jury, not always all the time, we will bring them back in the morning, let them deliberate awhile. If they are making any progress at all we will keep them. If Ms. Tony still says they are making no progress, I will check with you on whether you think it is appropriate to declare a mistrial.

(Id.)

The jury resumed its deliberations on September 30, 2010 at 9:30 a.m. At approximately 10:17 a.m., the jury sent the court another note stating that they were still deadlocked. (Doc. 73, p. 4). Camp informed counsel:

3

> Here is what I plan to do. If you all object to it or have a better idea, I will certainly be glad to entertain it. I think I am going to bring the jury in and I am going to personally question the foreperson about whether they are deadlocked, any chance of making any progress, or are they hopelessly deadlocked, and then I am going to ask the rest of the jurors as a group if there is anyone that feels that any progress can be made by further deliberations. If they - - and I think they will be, from the notes we've gotten, if they indicate that they are hopelessly deadlocked, I am going to impose a mistrial and ask if you object.
>
> Based on what they say, if either of you object, I will excuse the jury and - - well, I am not sure that I want you to have to object in front of the jury. Perhaps I will ask you to approach the bench and see if you think there can be any further progress, and I will decide, based on what your opinion is, as to whether to declare a mistrial and excuse the jury. Does that sound like a reasonable procedure?

(Trial Tr. vol. 4, p. 337).

Counsel agreed to the proposal, and the jury returned to the courtroom at 10:22 a.m. Camp confirmed with the foreperson that the jury was still deadlocked, and inquired as follows: "Because of all of the reasons I explained to you in my previous charge, do you think, in your opinion, are you hopelessly deadlocked, or is there any chance that you might be able to make some progress in your deliberations?" The foreperson responded that the jury was "[h]opelessly deadlocked. It is not going to happen." (Trial Tr. vol. 4, pp. 338-39). Camp then asked the other members of the jury as a group whether they had any opinion as to whether they were hopelessly deadlocked or whether they might be able to make some progress. When Camp asked if anyone thought the jury may be able to make

4

some progress with further deliberations, the jurors all shook their heads negatively. (Trial Tr. vol. 4, p. 339).

Camp called counsel to the bench, and stated that a mistrial appeared to be in order. Counsel both agreed to the declaration of the mistrial, which Camp subsequently made. (Trial Tr. vol. 4, p. 340).

The mistrial was declared on September 30, 2010. Camp was arrested by the Federal Bureau of Investigation ("FBI") on October 1, 2010 on charges of being an unlawful user of controlled substances in possession of firearms, in and affecting commerce, in violation of 18 U.S.C. § 922(g)(3); possession of controlled substances, in violation of 21 U.S.C. § 844(a); attempted possession of controlled substances, in violation of 21 U.S.C. §§ 846 and 844(a); aiding and abetting the possession of controlled substances by a previously convicted drug felon, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 844(a); and attempting to aid and abet the possession of controlled substances by a previously convicted drug felon, in violation of 21 U.S.C. §§ 846 and 844(a) and 18 U.S.C. § 2. (Case 1:10-mj-1415-TFH-CSC (N.D. Ga.) (Doc. 8)).

On November 19, 2010, Camp pleaded guilty to three counts: aiding and betting the unlawful possession of controlled substances by a person with a felony drug conviction; unlawful possession of controlled substances; and conversion of government property. (Case 1:10-cr-475-TFH (N.D. Ga.) (Doc. 3)). As part of his plea agreement, Camp stipulated to certain facts, including the following:

5

From in or about and between approximately May 2010 and October 1, 2010, the defendant, JACK T. CAMP, JR., knowingly and intentionally possessed cocaine, a Schedule II controlled substance, Roxycodone, a Schedule II controlled substance, and marihuana, a Schedule I controlled substance.

On several occasions in or about and between May 2010 and September 2010, when CAMP and CI-1 met in Atlanta, Georgia and elsewhere, they possessed and used drugs together including cocaine, a Schedule II controlled substance, Roxycodone, also known as 'Roxicet,' 'Roxi,' and 'Roxycontin,' an opiate and a Schedule II controlled substance, marihuana, a Schedule I controlled substance, and Xanax. . . .Generally, CI-1 and CAMP would use the drugs that CI-1 purchased with CAMP's money when they were together, though, on at least one occasion, CI-1 simply bought the drugs and gave them to CAMP. When CAMP and CI-1 would use drugs together, they would usually ingest the cocaine, Roxycodone, and Xanax by snorting it through their noses and they would ingest the marihuana by smoking it. In order to snort the Roxycodone and Xanax, CI-1 would crush the pills to create a powdered form of the drugs. At one point, CAMP gave CI-1 a pill crusher for CI-1's use.

On or about September 28, 2010, in a recorded telephone conversation, the defendant, JACK T. CAMP, JR., and CI-1 discussed getting together over the coming weekend. Specifically, CAMP and CI-1 discussed getting drugs that they could use together including cocaine and Roxycodone. CAMP indicated that he did, in fact, 'want to get some.' In deciding the type and quantity of drugs to purchase, CAMP stated 'I think I'd rather have the, what are they, Roxis, uh, but I don't mind sending a little extra if you want to get a little of the other too.' When asked if 'the other' meant cocaine, CAMP said yes. CI-1 asked if CAMP was going to use the cocaine with CI-1 and CAMP said that he would. As for the Roxycodone, CAMP ultimately decided that CI-1 should purchase 16 pills because 'that's an even number we can split.' CAMP and CI-1 discussed how much it would cost to purchase the

> drugs and CAMP told CI-1 that CAMP would give CI-1 the money to pay for the drugs.
>
> On September 28, 2010, the defendant, JACK T. CAMP, JR., went to the Western Union at Publix located at 370 Bullsboro Road, Newnan, Georgia and wired $290.00 to CI-1 for her to use to purchase Roxycodone and cocaine. CI-1 picked up the $290.00 on September 29, 2010.

(Case 1:10-cr-475-TFH (N.D. Ga.) (Doc. 3-2)).

According to the materials available to the Court, Camp and CI-1 did not speak again until October 1, 2010, at approximately 3:00 p.m., which was several hours after the mistrial was declared in Defendant's case.

On December 2, 2010, Sally Quillian Yates, the United States Attorney for the Northern District of Georgia, issued a statement regarding Camp. While her office was recused from the prosecution of Camp, her office did prosecute the case against Defendant. Because of concerns about the manner in which Camp performed his judicial duties, Yates disclosed certain information regarding Camp, including the following:

> According to witnesses and Camp, from approximately May, 2010 until the end of September, 2010, on a roughly biweekly basis, Camp engaged in the illegal use of controlled substances. During this approximately four-month period, Camp consumed marijuana, powder cocaine, Xanax, Roxicontin, and other unknown prescription painkillers. Both Camp and the individual with whom he consumed the drugs, ('Witness 1'), have stated that these drugs were not consumed together, although some may have been taken while Camp was also consuming alcohol. While Camp's use of these drugs was not limited to weekends, he denies that he used any of these drugs contemporaneously with any court business, and we are currently unaware of any demonstrable

7

> evidence to the contrary. We have not discovered evidence of illegal drug use prior to May 2010.

(Statement of U.S. Attorney Sally Quillian Yates, Dec. 2, 2010, http://www.justice.gov/usao/gan/press/index.html).

Yates also provided information about potential racial bias relating to the sentencing of African-American defendants. With regard to Defendant's case, Yates stated that "[o]ur review of information provided by the Clerk of Court indicates that the only criminal trial over which Camp presided from May, 2010 forward resulted in a mistrial due to a deadlocked jury." (Id.) Yates further stated that

> given these disturbing facts and allegations, this office will evaluate any criminal case adjudicated by Camp for impairment or bias that a defendant requests that we review. Furthermore, from May of 2010 forward, there is evidence that Camp's judicial decision-making process may have been impacted by bias and/or impairment and it has been established that he was involved in criminal conduct during this period. Therefore, we will not object to a defendant's request for a resentencing in any case in which the defendant was sentenced during this time.

(Id.)

Yates provided this same information to the Executive Director of the Northern District's Federal Defender Program in a letter dated December 3, 2010. (Doc. 99-1).

## II. MOTION TO DISMISS INDICTMENT

Defendant argues that there are two reasons why the indictment against him should be dismissed pursuant to the Double Jeopardy clause of the Fifth Amendment. First, he contends that there was no manifest necessity to declare a

8

mistrial. Second, he contends that there was misconduct on the part of the prosecutor or Government as a whole.

### A. Manifest Necessity

The Double Jeopardy clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The clause "protect[s] a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions." United States v. Dinitz, 424 U.S. 600, 611, 96 S.Ct. 1075 (1976). It also protects a defendant's "valued right to have his trial completed by a particular tribunal." Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834 (1949). There are exceptions to that right, however. One such exception exists when "there [was] a manifest necessity for the [mistrial]." United States v. Chica, 14 F.3d 1527, 1531 (11th Cir. 1994).

Whether manifest necessity for the mistrial existed is a "fact-intensive inquiry" not "susceptible to a mechanical formulation." Id. In the Eleventh Circuit, the following factors will be considered when reviewing the issue of manifest necessity: (1) the length of the trial, (2) the complexity of the issues involved, (3) the length of deliberations, and (4) the district court's communications with the jurors. United States v. Gordy, 526 F.2d 631, 635-36 (5th Cir. 1976).[1] "A statement from the jury that it is hopelessly deadlocked is a crucial factor," but "a present inability to agree

---

[1] Pursuant to Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), this Fifth Circuit decision is binding precedent.

9

is not determinative of the question of whether future deliberations might prove helpful." Id. The decision to grant a mistrial will be upheld "where the record, considered as a whole, indicates that the trial judge in deciding to declare a mistrial, carefully considered the alternatives and did not act in an abrupt, erratic or precipitate manner." Grandberry v. Bonner, 653 F.2d 1010, 1014 (5th Cir. 1981).

The burden of proving manifest necessity falls on the Government. *See* Oregon v. Kennedy, 456 U.S. 667, 683, 102 S.Ct. 2083 (1982) (Stevens, J., concurring). However, the requirement that manifest necessity be demonstrated operates only when the trial court has declared a mistrial without the consent of the defendant. United States v. Puleo, 817 F.2d 702, 705 (11th Cir. 1987). "When the defendant has moved for a mistrial or consents to its declaration, the double jeopardy clause will not bar his retrial." Id. (citations omitted).

It is clear from the record that Defendant consented to the mistrial. Normally that would be the end of the story. Id. Unfortunately, however, the situation before the Court is not normal. Defendant argues that if he had known about Camp's criminal conduct and the investigation of Camp he would have objected to the mistrial. Defendant contends that during the trial, Camp was influenced by and was under control of the Government through the confidential informant, known as CI-1. Defendant presented the idea during oral argument on this Motion that Camp may have told Cl-1 that Defendant's case would be over by Friday or something along those lines, and such a statement could support Defendant's argument that there was no manifest necessity for a mistrial.

10

Counsel for Defendant proposed a continuance of the second trial of this case so he could obtain information from the Government relating to Camp, including any recordings of Camp made during the course of Defendant's trial. The Court denied the request for continuance, but ordered the Government to produce copies of any audiotapes, videotapes, e-mails, computer printouts, or messages relating to the investigation of Camp or involving Camp created during the time he was handling matters associated with Defendant's trial. The Court informed the parties that it would conduct an *in camera* review of the items and determine if any of the information contained therein is exculpatory or would assist Defendant in his contention that he was unfairly prejudiced during his first trial due to the actions of Camp or the Government.  The Government has produced the following items, which the Court has reviewed: 22 compact discs, twelve of which contain recorded conversations involving Camp and/or CI-1 (some of which were duplicate conversations), nine of which are surveillance videos of Camp at various Publix supermarkets, and one of which contains surveillance video from the day Camp was arrested; a report from the Georgia Bureau of Investigation ("GBI"); confidential informant contact information from the GBI; 34 reports from the FBI; and 36 pages of e-mails and instant messages between Camp and CI-1. Certain portions of a conversation between Camp and CI-1 recorded on September 28, 2010 have been provided to Defendant. In the Court's opinion, however, nothing in the materials produced by the Government is exculpatory or supports Defendant's argument that Camp had a bent of mind to prematurely terminate the trial. Nevertheless, even

11

though the Court typically would not consider the issue because Defendant did not object to the mistrial at the first trial, the Court will examine the record and determine whether manifest necessity to declare a mistrial existed.

As discussed in more detail above, the jury in Defendant's first trial began deliberating at 3:15 p.m. on the second day of the trial. They continued deliberating until 5:05 p.m., when they were sent home. The jury resumed deliberating at 9:30 a.m. on the third day of the trial, and continued until 12:15 p.m. The jury was released for lunch, and resumed their deliberations at 1:30 p.m. The jury sent out a note around 2:42 p.m., stating that they were deadlocked. Camp gave an Allen charge, and the jury deliberated from 3:05 p.m. until 4:45 p.m., when they were released for the day. The jury returned on the fourth day and deliberated from 9:30 a.m. until approximately 10:17 a.m., when they sent out another note stating that they were deadlocked. Camp brought the jury into the courtroom and questioned the foreperson as to whether the jury was in fact deadlocked, and she stated that they were. Camp then asked the rest of the jury if they believed they could make any progress on the case, and they all responded in the negative. After conferring with counsel, Camp then declared the mistrial.

Upon review of the record and other materials produced, the Court finds that manifest necessity required the declaration of a mistrial. The jury deliberated for approximately ten hours following a case involving approximately eight hours of evidence and argument. While Defendant seems to argue that ten hours was not a sufficient amount of time for the deliberations, there is nothing in the record to

12

indicate that Camp ever rushed the jurors to reach a decision in any way. In any event, "there is no uniform minimum period during which a jury must deliberate before the court may declare a hung jury." United States ex rel. Webb v. Court of Common Pleas, 516 F.2d 1034, 1044 (3d Cir. 1975). Instead, the court must consider all of the circumstances before it. The jury sent out two notes on two separate days stating that they were deadlocked. The decision to grant a mistrial because of a hung jury has "long [been] considered the classic basis for a proper mistrial." United States v. Berroa, 374 F.3d 1053, 1057 (11th Cir. 2004). An Allen charge was given after the first note. Another Allen charge was given after the second note, but the jury made it clear that they did not expect to make any additional progress in their deliberations. "Considered as a whole, the circumstances reveal that the court's decision was not an abrupt, precipitous response to a single note from the jury, but was a deliberate decision made subsequent to three days of deliberations, a prior note declaring an inability to agree, and the jury's prior receipt of a modified *Allen* charge." Id. at 1059.

While Defendant points to two statements made by Camp during the trial as evidence that Camp intended to terminate the proceedings no matter what prior to the weekend so he could rendezvous with CI-1, when looked at in context, the statements do not support Defendant's argument. The first was made during the jury charge conference, outside the presence of the jury, when Camp stated: "Look, I am trying to get this wrapped up, though." (Trial Tr. vol. 2., p. 277). It is clear to the Court that Camp was attempting to wrap up the charge conference and nothing more.

13

Camp's statement was not abnormal by any means, as the Court has likely made similar statements during its charge conferences. The second statement identified by Defendant was made when Camp and counsel discussed how long they would have for closing arguments. This discussion also took place outside the presence of the jury. Counsel for Defendant asked for 45 minutes for his argument, and Camp said: "Let me see how much time we have, because I want to get it to the jury." (Trial Tr. vol. 2, p. 278). If the remainder of what Camp said to counsel is ignored, his statement might raise some suspicion. But Camp went on to say: "I would like for [the jury] to have some time to pick a foreman and deliberate today, and then I don't think they will finish today." (Id.) The Court sees no improper motive in Camp's statement that he wanted to get the case to the jury. Most judges, including the undersigned, wish to have the jury start their deliberations as soon as possible after the close of evidence so their memories are as fresh and accurate as possible. Further, the longer it takes to get the case to the jury, the greater the risk of an injection of error. Once the evidence has been concluded, it is desirable to get the case to the jury sooner rather than later because it lowers the possibility of the proceedings being tainted by some unexpected error.

Further, it was not as if Camp stated that he wanted a verdict that day or he wanted to complete the trial that day. He plainly stated that in his opinion the jury was unlikely to reach a verdict that day and he would have them return the following day. There is simply no merit to Defendant's argument that these statements made by Camp show an impetus to prematurely terminate the trial.

14

It should also be noted that Camp complied with Federal Rule of Criminal Procedure 26.3 in connection with his order of mistrial. Rule 26.3 provides: "Before ordering a mistrial, the court must give each defendant and the government an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives." Fed. R. Crim. P. 26.3. The record shows that Camp and counsel had previously discussed the possibility of a mistrial and any alternatives to a mistrial, and Camp gave counsel the opportunity to object prior to declaring the mistrial.

The Court also points out that the "'determination of manifest necessity for a mistrial depends upon the state of the jury rather than the state of the judge.'" United States v. Felton, 262 Fed. App'x 195, 199 (11th Cir. 2008) (quoting Gordy, 526 F.2d at 632). For example, in Felton, the record showed that the judge was eager to close the case on the first night of deliberations, a Friday, rather than continue deliberations on Monday, because of a scheduled surgery. The Eleventh Circuit stated that whether there was manifest necessity for the mistrial depended on the state of the jury, not the judge, and found that the record taken as a whole revealed that the court acted for reasons completely unrelated to the purported basis for the mistrial ruling, which was a deadlocked jury. The court held that there was no manifest necessity to compel the district court's order of a mistrial. Id. at 199. In Defendant's case, on the other hand, looking at the record as a whole, it is clear to this Court at least, that regardless of Camp's internal thought process, the jury was in fact deadlocked and a mistrial was appropriate.

### B.     Prosecutorial Misconduct

Defendant's second argument is that his trial was constitutionally unfair because of prosecutorial misconduct. In a case where a prosecutor is alleged to have intended to provoke a mistrial or otherwise engaged in misconduct, the defendant has the burden. *See* Oregon, 456 U.S. at 683 (Stevens, J., concurring).

"The duty of a prosecutor, as the representative of the sovereign in a criminal case, is not that it shall win a case but that justice shall be done." United States v. Mauskar, 557 F.3d 219, 232 (5th Cir. 2009) (quoting Dickson v. Quarterman, 462 F.3d 470, 479 (5th Cir. 2006) (internal quotation marks and citations omitted)). Prosecutorial misconduct may "so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868 (1974). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375 (1985) (quoting United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392 (1976)).

"Government misconduct does not mandate dismissal of an indictment unless it is 'so outrageous' that it violates the principles of 'fundamental fairness' under the due process clause of the Fifth Amendment." United States v. Johnson, 68 F.3d 899, 902 (5th Cir. 1995) (citing United States v. Russell, 411 U.S. 423, 431-32, 93 S.Ct. 1637 (1973)). "Such a violation will only be found in the rarest of circumstances." Id. (citing United States v. Yater, 756 F.2d 1058, 1066 (5th Cir. 1985)).

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 218, 102 S.Ct. 940 (1982). Improper conduct by the prosecutor is not, in itself, sufficient to constitute constitutional error, even when the conduct is alleged to be deliberate. "Improper conduct only becomes constitutional error when the *impact* of the conduct is to distract the trier of fact and thus raise doubts about the fairness of the trial." Marshall v. Hendricks, 307 F.3d 36, 37 (3d Cir. 2002) (emphasis in original).

Defendant argues that the Government should have moved to continue the trial. He states that while Gerald Sachs, the Assistant United States Attorney who tried the case on behalf of the Government, may not have known about the investigation of Camp, someone in the U.S. Attorney's Office for the Northern District knew about the investigation and should have moved to continue the case.

The information produced to the Court shows that the U.S. Attorney's Office was first notified about the allegations against Camp on September 24, 2010, the Friday before the start of Defendant's trial. There is no evidence that Sachs was aware of the investigation. Even assuming Sachs did know what was going on, Defendant has not shown how the trial was unfair to him or how the Government's knowledge affected the jury, which was clearly deadlocked.

### III.   CONCLUSION

For the reasons discussed above, Defendant's Motion to Dismiss or in the Alternative, Plea in Bar of Former Jeopardy (Doc. 93) is denied.

17

**SO ORDERED**, this 13th day of December, 2010.

<u>/s/ Hugh Lawson</u>
**HUGH LAWSON, SENIOR JUDGE**

mbh